**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LORA LEE LAIRD,** | § | |
| | § | |
| | § | **CIV. A. NO. _____** |
| *Plaintiff,* | § | |
| | § | **JURY DEMANDED** |
| **v.** | § | |
| | § | |
| **AT&T, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

## ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Lora Lee Laird complains of violations by Defendant AT&T, Inc. (hereinafter "AT&T" or Defendant) of federal law prohibiting sex discrimination and age discrimination. As a result of Laird's desperate plea for help in the form of an EEOC charge she filed in November 2017, AT&T relented from its efforts to terminate her, but AT&T left Laird's discriminatory demotion in place and bereft of an upward career path. Laird is still an employee of AT&T. Laird claims she was demoted, that she was targeted for termination, that AT&T ended her career progress, that she was subjected to a hostile work environment, and that AT&T has a pattern or practice of age and gender discrimination against older female employees. Laird seeks redress under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.* In support thereof Laird respectfully states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Laird is a female citizen of Plano, Collin County, Texas. She is 58 years of age.

2.      AT&T is corporation organized and existing under the laws of the state of Delaware, employing Laird and others in Texas. The causes of action asserted below arose from and are connected to purposeful acts by AT&T during Laird's employment in Texas. AT&T may be served with process through its registered agent, CT Corporation System 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3140.

3.      This court has jurisdiction to hear the merits of Laird's claims under 28 U.S.C. §§ 1331 and 1343.

4.      The corporate headquarters of AT&T is 208 S. Akard St., Dallas, Texas 75202 and a substantial portion of the acts and omissions underlying Laird's claims—including the unlawful failure to promote —occurred in Dallas, Texas. Venue is proper in this district and division under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

5.      AT&T is an American multinational conglomerate holding company.  AT&T is the world's largest telecommunications company, the largest provider of mobile telephone services, and the largest provider of fixed telephone services in the United States through AT&T Communications.  Since June 14, 2018, it is also the parent company of mass media conglomerate WarnerMedia, making it the world's largest media and entertainment company in terms of revenue.  As of 2018, AT&T was ranked number 9 on the Fortune 500 rankings of the largest United States corporations by total revenue.  In 2020, AT&T had 243,350 employees.

6.      AT&T was at all times relevant to Laird's claims and is now an "employer" within the meaning of 42 U.S.C. § 2000-e(b).

## LAIRD PERFORMS WELL
## AND HER CAREER PROGRESSES UPWARDS AT AT&T

7.    Laird obtained a Bachelor of Administration degree in marketing from West Texas A&M University School of Business before she began her employment with AT&T.  She started at AT&T (Southwestern Bell at the time) when she was 26 years old, in March 1988.  During her 32-year career with AT&T, Laird has been loyal, she has worked very hard, and her performance has been very good.

8.    Laird's work journey with AT&T started in Amarillo, Texas.  Then she was promoted from a manager position, to several Director positions, promoted to a Regional Director position, and then promoted to a Level 4 position as Assistant Vice President –Sales Operations (VPSO) as of June 2013, then added marketing to her responsibilities as Assistant Vice President – Marketing and Operations (VPMO) as of February 2015.  After Amarillo, Texas, Laird's moves for AT&T were to Austin, Texas; Zurich, Switzerland (a job to which Laird moved while pregnant); Houston, Texas; back to Austin, Texas; Oklahoma City, Oklahoma; and finally, Dallas, Texas.  Laird held 13 progressive roles.

9.    Before AT&T demoted Laird in 2017 and attempted to terminate her, Laird's last "permanent" job with AT&T, was Assistant Vice President Marketing and Operations (AVPMO).  Laird's job was to lead the operations and marketing team for one of four (and then three) regions in the country, the Central Region, with sales, customer and employee experience, distribution, staffing, operations, business continuity, customer life cycle, analytics, marketing and advertising responsibilities.  The organization reporting to Laird included 33 people.

10.   Before AT&T demoted Laird in 2017 and attempted to get rid of her because of her age and gender, Laird's performance with AT&T was consistently very good.  AT&T has an annual review process with grades rating, from top to bottom:  Far Exceeds (FE)(very rare); Exceeds/Excels (E); Fully Meets (FM), MS (Meets Some); and None.  Laird's career ratings had

been E's and FM's and primarily Exceeds/Excels and always Exceeds/Excels in the leadership category. Until the 2017 demotion, for Laird's overall ratings since 2011 (received in 2012) Laird received:

- E in 2011

- E in 2012

- FM in 2013 (when Laird was newly promoted to an L4 position);

- E in 2014;

- E in 2015;

- FM in 2016 (a rating delivered to Laird in February 2017).

- Laird never received formal discipline or disciplinary action.

- Laird received awards: More than 5 times she received the Summit/Annual Sales Award (top 2%) as well as many other performance awards.

- AT&T officially designated Laird as High Potential multiple years through 2015.

11. AT&T has a "moving" culture. It is considered normal at AT&T for employees to move roles about every 2 years. Starting at about the time that AT&T rated Laird a "Fully Meets" instead of "Exceeds" for 2016, a rating it provided to Laird in February 2017, AT&T management revealed to Laird in a slow and cruel way that she had "been here too long," and that (a) thus you do not have a job now (AT&T gave Laird's job to a substantially younger employee) and (b) "you will be terminated on January 15, 2018," clearly because of Laird's disfavored status as an older female.

**FIRST HINT (IN HINDSIGHT) TO LAIRD THAT
AT&T INTENDED TO PUT HER OUT TO PASTURE**

12. Rasesh Patel ("Patel"), who at the time was in his early to mid-40's and was new to Laird's organization, became the new Regional President over the Central Region in November

2016.  Early in 2017, Mr. Patel met with Laird one on one and asked for her feedback. After Laird

provided Mr. Patel feedback regarding the region and his first few of months in the role, Laird

asked for his feedback.  Patel asked Laird, "What do you want to do next?"  He added, "You've

been here too long – that's the feedback."  Patel asked Laird if she was mobile. Laird said yes,

however it would be great to stay in Texas, too.  Laird added that her son would graduate from

high school in June, so she would want to wait until after graduation.  Patel asked Laird if she had

the role or a part of the business that she wanted to pursue and added that he would work with her

for the next couple of years if she were to stay in the role.  At the time of this meeting, Laird did

not realize that her career was in danger.

## AT&T GIVES LAIRD NOTICE OF HER DEMISE

13.     On or about March 20, 2017, Mr. Patel met with Laird again one-on-one, for about

an hour.  This meeting was just prior to the successful (and highly stressful) national operations

review with Senior Executives.  In this meeting, Mr. Patel told Laird he wanted to go ahead and

make a change.  **Patel told Laird that she had been in the Central Region and the Sales and**

**Distribution organization (the organization run by Brian Shay) too long and that change was**

**needed for her and the organization.  Patel told Laird that Senior Leadership wanted to**

**make a change in leadership for the Central Region operations team for "new perspective"**

**and a "fresh set of eyes."  (This is code for age discrimination.)  Laird asked why and if she**

**had a performance issue.  Patel added, "This is not a performance issue.**  If it were a

performance issue, we would be having a very different discussion."  Patel did not tell Laird that

her performance was lacking.

14.     Patel told Laird in this meeting that she should work with Kristie Sadlon (in HR)

for her next opportunity.  Patel added, "You will thank me in a year.  This is good for your

development." These statements were false. Patel added that he would wait to make the change until after the operations review, by May 1, 2017. Patel told Laird, "You, me and Kristie are the only ones who know. Just the three of us." Laird did not think this could be true, since HR (including Keith Jackson) and his boss (Brian Shay) had to know.

15.     At this one-on-one meeting, Patel also told Laird that she needed to start looking outside the Brian Shay and Central Region organization for an on-level position (L4). Patel told Laird that if she could not find a position in 30 days (before May 1, 2017), she would be moved to a special project in the interim, but that could not go on forever. Patel said the special project would need to be meaningful, but keep Laird out of the way of the new VPMO (this was the vanity title of the AVP Sales Ops – Vice President of Marketing and Operations – the job AT&T was taking away from Laird) and not impact the region or the transition.

16.     Laird asked Patel why AT&T was not providing a "swap" for her. Swaps, or "rotations" were not unusual at the L3 (Director – one level below Laird) and L4 (Laird level) levels. Patel had no explanation for the way AT&T was displacing Laird with no job to go into.

### AT&T FORCES LAIRD TO THE EXIT DOOR, LAIRD STRUGGLES TO AVOID TERMINATION, AND AT&T PROVIDES LAIRD ONLY SHAM INTERVIEWS

17.     Laird began looking for another position as hard as she could, trying to remain positive, professional, and a contributor. From April 21, 2017 to October 11, 2017, Laird had applied for 26 jobs – all of which she was qualified for. AT&T provided Laird a total of five interviews, but no offers. AT&T provided Laird only sham (or "courtesy") interviews. It became plain to Laird that AT&T had decided that Laird was on her way to termination because she was an older female, but that AT&T wanted Laird to "get the hint" and leave quietly. AT&T subjected Laird to a painful, humiliating process.

18.   Part of the "run her off," or "show her the handwriting on the wall," or "show her the exit door," or "put her out to pasture" treatment was a series cruel slights and insults deliberately orchestrated to hurt Laird's feelings, damage her reputation, lower her self-esteem and self-confidence, and prepare her for "the inevitable" – termination because of her age and gender.  An example of this was March 21-22, 2017, when Patel failed to introduce Laird as part of the team, even as he introduced everyone else in a national leadership meeting in Nashville.  It was as if Laird was not there, as if Laird did not count, as if Laird was gone already.

19.   **Sham Job Interview Number 1 (April 21, 2017):**  On April 21, 2017, AT&T provided Laird an interview for a Level 4 (Laird's level) AVP Staffing position.  AT&T gave this job to a Hispanic male, who AT&T promoted from a Director position (Level 3). If AT&T had selected Laird, this would have been a lateral move for Laird.  This was an opportunity Laird identified and worked to secure during the thirty days prior to the formal announcement of her role change.

20.   A few days prior to April 28, 2017, Patel informed Laird who the person was that was being placed in Laird's role and the communication plan for the announcements.  On April 28, 2017, a call was hosted with the Central Region direct report leadership team of Mr. Patel to inform them of the leadership changes of the new VPMO and Laird's transition to working on key initiatives.  Directly after that session, Patel hosted a group meeting with Laird's team to make the announcements.  Laird attended both meetings in person, and they were followed by a formal email announcement later in the day that included Laird, Keri Hissim, and Matt Palmer's new roles.  Matt Palmer was a Director on Laird's team who was moving to a development role in the Partner Exchange Organization.

21.     **On May 1, 2017, AT&T officially removed Laird from her position**, replaced her with Keri Hissim (female, early 40's), and announced Ms. Hissim was the new person for Laird's role and Laird's move to a "special projects" role.   No one from AT&T ever told Laird why Ms. Hissim was given Laird's job or why Laird's job was taken from her without a new role for Laird to go to, other than that it was not Laird's performance and that Laird had been there too long – **code for age discrimination**.   It was apparent to Laird that AT&T viewed her as a "blocker," an older female employee who was now in the way of a younger employee it wanted to provide a development opportunity.

22.     After the job removal, AT&T saw to it that Laird could not keep the "special project" that Laird had been assigned to after it gave Laird's Level 4 AVP position to Ms. Hissim. When AT&T turned the special project into a permanent new L4 role, unlike how Laird's prior role was filled, this particular role was posted just two weeks after Laird's role was filled without posting a job requisition.  Even though Laird was doing the job already – AT&T did not allow her to keep it.

23.     **Sham Job Interview Number 2 (May 16, 2017):**   On May 16, 2017, AT&T provided Laird another sham interview.  Laird was one of four employees who interviewed for the newly created job (that had been Laird's special project job).  AT&T awarded the job to a younger male employee who had reported to Laird when that younger  male employee was an L3 director. This was a promotion for the younger male employee.  AT&T viewed Laird as a blocker, in the way of a promotion for a younger employee.  More hurtful to Laird still, she knew that if AT&T had wanted to promote the younger male employee it could have done so without awarding him the job Laird was filling. There were other L4 positions open and available for which the younger male employee was qualified.  AT&T broke its standard procedure for Laird's non-selection:  The

hiring manager did not call Laird personally to let Laird know that she was not selected. Instead, Patel informed Laird of the decision and said, "it was bittersweet for me." Later, however, Laird was told that Brian Shay said "no" for Laird on an AVP position in the newly created In Home Solutions (IHX) organization (i.e. – Laird's special project).

24.     During this time, AT&T subjected Laird to a hostile work environment by means of a series of slights and insults. This included the uncomfortable and hurtful situation of not allowing Laird to tell her team personally about her role change. Laird was at the same meeting when Patel introduced Ms. Hissim in person to Laird's team, one business day after the announcement. This was clearly planned in advance. Rubbing it in, AT&T had Laird office adjacent to Ms. Hissim. After Ms. Hissim replaced Laird, AT&T management invited Ms. Hissim to attend and be on the stage with Laird during the Summit Awards top performer trip that Laird had been asked to see through, due to its timing during the first week of May 2017.

25.     Promises by AT&T of assistance in finding a new role did not lead to anything positive and were limited to an occasional email to a hiring manager or introduction to leaders that Laird did not know. The leadership team at AT&T had the ability to place Laird in a role and did not done so, with no explanation other than "you have been here too long," which was really just telling Laird that she was too old. Breaking normal procedure, AT&T failed to provide a swap for Laird. AT&T often makes position placements, job rotations or swaps to facilitate development role transitions. AT&T withheld all these tools from Laird due to her age and gender. Within the timeframe from May 1, 2017 to November 22, 2017, AT&T created multiple L3/L4 "rotations or swaps," including, but not necessarily limited to:

- In about June 2017, Gary Corley-Central Region finance and Hunter Johnson-Headquarters finance rotated roles due to a facilitated job swap. Both were Level 3 Finance Directors (Lateral).

- In about October 2017, Cara Fields-AVP Authorized Retail and Caleb Deerinwater- AVP Customer Care rotated roles due to a facilitated job swap. Both were Level 4 Assistant Vice Presidents.

26.     Within the timeframe from May 1, 2017 to November 22, 2017, Laird was only been able to apply for roles that were officially open and taking applications.  Laird actively networked internally, applied for positions, and worked on a few projects when given the chance.

27.     As of October 11, 2017, Laird had applied for 26 jobs.  Laird was qualified for all 26 jobs. AT&T failed to consider and/or accept Laird for all 26 of these jobs because of her age and gender.  For all these job applications, AT&T only provided Laird only five formal job interviews and a few exploratory discussions (including the interview for "her" special projects job), and they were sham or "courtesy" interviews.  The sham or courtesy interviews were part of the hostile work environment to which AT&T subjected Laird.  For Laird, a sham or "courtesy" interview was cruel, not courteous.   As she underwent these interviews, Laird could feel her career slipping away and she could tell that AT&T was only going through the motions, hoping Laird would leave her employment with AT&T quietly.

28.     **Sham Job Interview Number 3 (June 23, 2017):**  On June 23, 2017, AT&T provided Laird another sham interview.  This was a Level 4 AVP – Digital and Social Care position.  AT&T awarded this job to a slightly younger female, a lateral selection for the person selected.  Since the candidate selected had been Chief of Staff for the leader of the organization, providing Laird an interview opportunity for this job was a way for AT&T to make it look like Laird had a chance for a job without risking Laird being selected and taken off the path for termination.

29.     **Sham Job Interview Number 4 (June 30, 2017):**  On June 30, 2017, AT&T provided Laird another sham interview.  The interview was for a Level 3 director position, which

would have been a demotion for Laird – a customer care position in Dallas.  More than three months after Laird's interview for this position, AT&T announced that it was not hiring for this job.  AT&T cancelled the position on October 9, 2017.

30.    **Sham Job Interview Number 5 (July 19 and 26, 2017):**  On July 19 and 26, 2017, AT&T provided Laird another sham interview.  Laird interviewed for another Level 3 Director position – Director of Channel Partners.  Laird's interview was with Charlie Conway, who reported to someone who had always been favorable toward Laird, Andy Shibley, but who reported to Brian Shay (who wanted Laird gone because of her age – because she had been there too long).  Mr. Conway called Laird after the interview and told her that he had picked someone else. (During an earlier one-on-one meeting with Patel, referring to Mr. Shibley,  Patel told Laird, "Even Andy says you've been around too long.")

### OTHER WAYS AT&T KEPT LAIRD OUT OF JOBS

31.    Besides the sham or sabotaged job interviews, AT&T kept Laird out of other jobs that demonstrate that AT&T decided that Laird should go because of her age and gender – because she had been around too long.  Laird was interested in and well qualified for a position in Austin, Texas – a Level 3 job.  When Laird inquired about it on July 17, 2017, the hiring manager literally told Laird in an email that he was only doing courtesy interviews and the candidate was already selected. The requisition had been open only 2 or 3 days, the job was still posted for 4 more days, but Laird was told she would not get the job (or an interview) and was immediately notified via a system generated email even though the position remained officially open in the Career Path system for several days afterwards.

32.    AT&T kept Laird out of a job as Director of Retail Execution in Tennessee.  This job was the Level 3 field version of the job Laird had been doing until displaced for a much younger

female (Hissim) on May 1, 2017.  The job, which reported within the Brian Shay organization, was not for Laird – per a text from Kristi Turner a few days after Laird applied for the role and was not offered an interview.

33.     About August 1, 2017 Patel came to Laird's office after announcing to his direct report team that he was being promoted to a new role in preparation for a pending merger. Patel was promoted to SEVP of Digital, Retail and Care with Brian Shay later being announced as a direct report to Patel.  Patel told Laird, "I am now in a position to be more helpful to you (referring to his earlier promotion announcement). Surely, we can find you an opportunity, we are a large organization. Give me a couple of weeks."

## AT&T NOTIFIES LAIRD OF IMMINENT SEPARATION

34.     On October 10, 2017, AT&T (Fred Devereux and Kristie Sadlon) told Laird, "You are in an affected work group and this is the 30-day pre-notification." "On November 16, 2017, the final decisions and severance packages will be communicated."  In addition, "the affected work group is you and Keri Hissim."   Laird was aware that being offered a package at AT&T means an employee is being terminated. So, Laird knew she was being told that she would be notified of her termination on November 16, 2017, and that she would be fired if she had not secured some role with AT&T by January 15, 2018.

## LAIRD STRUGGLES TO SURVIVE AT AT&T

35.     Toward the end of October 2017, Laird scheduled another meeting with Patel, who had told her on August 1, 2017, "give me a couple of weeks."  Patel missed the appointment with Laird.  Laird rescheduled it for the following week, and she met with Patel on October 30, 2017.  At the start of their meeting Patel said to Laird, "I thought you had already been placed."  Laird said, "no."  Laird told him that she was open to relocation and that she had applied even for director

jobs – a level below her L4 level.  Laird asked for Patel's help.  Patel said he would email his direct reports to see if there were any opportunities but there are no promises.  Patel did not tell Laird about any opportunity for saving her career.

36.    During the week of October 16, 2017, Laird met with the new President of the Central Region, Fred Devereux.  Devereux said to Laird, "You're in a predicament, aren't you." Laird said, "Yes.  I need to find an opportunity.  I'm not in a good position.  I need your help." After that, Mr. Devereux did not tell Laird about any opportunity for saving her career.

37.    In her efforts to stay employed, Laird met again with Mr. Devereux on November 6, 2017 to see if he had any insights for jobs she might get.  He told Laird, "It's going to be hard. You keep your head up and are positive. That says a lot about you.  I want to help. It makes people want to help you."

## AT&T SUBJECTS LAIRD TO ANOTHER SHAM INTERVIEW

38.    **Sham Job Interview Number 6 (November 14, 2017):**  On November 14, 2017, AT&T provided Laird another sham interview.  This is a Level 4 AVP – Sponsorships position in El Segundo, California.  Laird interviewed by telepresence with Mark Wright.  Mr. Wright told Laird that he was early in the process.  This was another sham interview, designed to make it look like AT&T has not pre-determined that Laird was to be terminated.  Laird learned two days after her interview, on November 16, 2017, that the job has been awarded to a 40-year-old female. Laird's interview was a sham, since it would be virtually impossible to make a candidate selection, route that selection for officer approvals, make the offer, write the announcement, and obtain approval by legal and HR between the time Laird was interviewed and the time AT&T announced the selection of this 40-year-old candidate.  Another indication that her interview on November 14, 2017 was window dressing was that AT&T failed to follow normal procedure – the hiring

manager did not call Laird to tell her that she had not been selected for the job for which she had interviewed.  Instead, Laird read it in the official announcement on November 16, 2017 and did not receive a system generated notification until November 21, 2017.

39.     Generally, Laird's job search showed her that AT&T had lots of jobs, but no jobs for Laird; because of her age and gender Laird had been at AT&T too long.  Once, when Laird asked about an open L3 position, she was told: "I don't know if the sales operations organization will be an option; I am not sure how much Vickie (a peer of Brian Shay) listens to Brian (referring to Brian Shay – who thought that Laird had been at AT&T too long) and other similar statements.

40.     After October 10, 2017, Laird applied for additional roles --two Director positions (L3) and an AVP (L4) position.  One interview was granted for the L4 role (noted above as Job Interview Number 6).

**LAIRD REACHES WHAT APPEARS GO BE HER TERMINATION DAY**

41.     Laird had been told prior to November 16, 2017, that this was the day that the Central Region employees that are within an affected work group are to get final determination of status.  It is AT&T's standard procedure to share the news with those negatively impacted first. This is the normal process:

- Impacted (severance) employees are notified first privately (early morning);

- When that is done, then those employees in the affected work group that have a role (new or existing) are notified privately;

- Followed by smaller meetings to inform direct reports/teams of any changes in supervisor or organization structure;

- Following day, formal organization announcements are distributed.

The normal process worked for everyone but Laird and Keri Hissim (the two AVPs in the artificially manipulated "affected work group") on November 16th.  AT&T handled Laird's situation outside the normal process as follows on November 16, 2017:

a.   A telephone call was scheduled (with no meeting planner verbally from Kristie Sadlon) with Fred Devereux, Regional President Central Region from 1-1:30pm Central Time. Mr. Devereux was an officer of AT&T and thus is in attendance of the annual AT&T Officers conference in Arizona.

b.   Laird was ready at 1:00 pm.   Laird waited until 1:27 pm, when she sent a text to Devereux asking if he had an approximate time he may be calling. Laird continued to wait until 2:26 pm.

c.   Devereux sent a text back at 2:26 pm CST saying "had hoped to call by now but haven't been able to get privacy. Can I call you when I land at 4:30ish?

d.   Laird responded: "Ok. That will work. Thank you- was worried I had missed you or something. Pls just text if it needs to be later so you can be in a good place to have the call."

e.   Kristie Sadlon (of HR) eventually sent Laird a text asking if Laird had talked with Devereux.  Laird called Sadlon to explain what had happened.  Sadlon shared that Keri Hissim had called her to ask when Mr. Devereux was going to call her.  Kristie Hissim indicated she and Laird would both be receiving an email packet after the conversation.

f.   Fred Devereux called Laird at 5:17 pm, after Laird had waited from 4:30 pm central time for his call. All other affected work group employees had been notified of their status.  Devereux was apologetic, but the treatment hurt Laird.

42.   During the phone call that started at 5:17 pm, Devereux apologized for not being present in person. He said it was not a good day, that it was a tough day, and this was not a call he wanted to make. He stated that in the force reduction there is not a role for Laird. He said that this day was the start of the 60-day clock. He said that he would work with Laird on trying to land another opportunity and hopefully be able to do so within the 60 days.  He also told Laird that he spent some time with Fiona Carter on Laird's behalf advocating for the AVP Sponsorships role.

43.     Laird said, "Thank you for doing that on my behalf, Fred.  However, I am not certain why I was interviewed as the role was formally announced just 48 hours after my interview earlier today."

44.     Devereux expressed regret and disappointment.

45.     Laird was very sad, even though she knew this was going to be the outcome, so she paused to compose herself.  **Laird then asked Devereux, "It was not made clear to me; can you help me understand, do you know why I was removed from my position of VPMO since it was stated to not be due to performance?"**

46.     **Devereux said, "I don't know why you were removed from the role.**  I was in the West Region at the time and was not close to it.  **I just thought it was for development,** I don't really know."  He told Laird that he would continue to work with her and advocate for her as she was willing to do whatever is best for the business and had handled herself so well. Devereux said Laird had many advocates. He also said he was hopeful something might come available and that Laird could be considered for a Director role in his organization for one of the VPGMs.  Devereux said, "We will work with them, but there is nothing today."  Devereux was complimentary of Laird and said, "If you are in the office, let's talk in person instead of over the phone."

47.     Laird said she had planned to work remote the next day and Devereux said, "don't change you plans for me, either is fine."

48.     Laird closed the call saying that she cared about the organization and the people. Laird lobbied to hang onto her employment with AT&T.  She stated that she had a lot to contribute and had been a key contributor, making a material difference to the business. Laird told Devereux that she wanted to continue to be part of the organization, to make an impact and to develop.  The call ended after a few minutes.

## AT&T HAS A PATTERN OR PRACTICE OF AGE
## AND GENDER DISCRIMINATION

49.     AT&T manipulated the rank and rate process to create a group of 2 employees to compare, rather than the group of 7 as it did for directors in Laird's region. AT&T only ranked and rated Hissim and Laird (two Level 4 employees) rather than all seven Level 4 employees in the Central Region – 5 AVP's of sales, plus Hissim and Laird.  With the possible exception of one white male (John Christie) who might be about Laird's age, Laird was the oldest of the 7 AVP's as AT&T programmed Laird for termination.

50.     Evidence supports an inference of age discrimination.  Laird being told that she had been here too long is the equivalent of being told that the reason for her demise is that she is not a spring chicken.  This is evidence of age discrimination.  *Woolsey v. Klingspor Abrasives, Inc*., _F.Supp.2d_ , 2010 WL 4883652, *4 (N.D. Tex. 2010).

51.     The reasons given for Laird's upcoming termination and her demotion from VPMO (AVP – L4) were false and pretextual.  AT&T refused to give Laird a reason for her demotion. Although Laird asked, AT&T failed to give her any reason for the takeaway of her VPMO (AVP-4) position without a role to go to, and AT&T admitted it was not due to performance.  This is evidence of pretext.  *Mock v. Bell Helicopter Textron, Inc.,* 196 Fed.Appx. 773, 774 (11th Cir. 2006).   Further, Laird's job was not eliminated.  Instead, AT&T took the job from Laird in May 2017 and gave it to a substantially younger employee, a female named Keri Hissim. The "rank and rate" process AT&T claims it used as it was about to usher Laird out the door in November 2017 was a cover-up to make this take-from-Laird and give to Hissim scenario look "normal." Next, AT&T made only a sham investigation, claiming in early January 2018 that it had made an "internal investigation" that "revealed" that Laird's discrimination allegations "are without merit." A sham investigation is evidence or pretext.  *Trujillo v. PacifiCorp.,* 524 F.3d 1149, 1159 (10th

Cir. 2008); *Tisdale v. Federal Express Corp.,* 415 F.3d 516, 529-30 (6th Cir. 2005)(defendant's failure to speak to important witnesses and collect relevant evidence in investigation was evidence of pretext); *Mastro v. Potomac Elec. Power Co*., 447 F.3d 843, 855-56 (D.C. Cir. 2006).  Further, when AT&T submitted a position statement to the EEOC dated March 14, 2018, AT&T lied and stated that Laird had been told "that her results for the Central Region were lacking."  This is false – and thus evidence of mendacity and pretext.  *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000).   Laird's results were not lacking, and AT&T did not tell her that her results were lacking.  And AT&T did not tell Laird this was the reason for the takeaway.  Laird was told the contrary, that it was not due to performance.  Such a misrepresentation by AT&T to the EEOC is evidence of pretext.  *Miller v. Raytheon Co.,* 716 F.3d 138 (5th Cir. 2013).  When AT&T took away Laird's job, leaving her without one, AT&T put Laird in harm's way – set her up to fail – so that she could be terminated as "surplus."  And AT&T told her she was in harm's way.  This treatment was part of the hostile work environment that AT&T subjected Laird to, a hostile work environment designed to bully her into giving up, taking a "package" and leaving.

52.     After AT&T took away Laird's VPMO (AVP L-4) position and gave it to much younger Hissim, as a developmental opportunity for Hissim and because AT&T viewed Laird as an old female, one who had already "developed," and one who had been here too long, AT&T made a concerted effort to keep Laird from saving her career by finding another position, either at a Level 4 or Level 3 position.

53.     AT&T's swift act of "finding" her a Level 3 demotion opportunity only after she filed her EEOC charge and notified AT&T'S top officers that she had done so, shows that AT&T was on the path to firing Laird, as she alleged, but that AT&T changed its course in hopes of covering up its wrongful conduct and/or limiting its liability for its wrongful conduct.  AT&T left

the discriminatory demotion in place,  and did nothing to address the emotional distress it inflicted

upon Laird.  AT&T's age and gender discrimination against Laird is willful and malicious and part

of the company's ongoing plan to terminate Laird because she was an older female – because as

they literally say, Laird has been here too long.  AT&T's behavior fits the illegal pattern shown by

Raytheon against one of its 29-year employees, Richard Miller.  *See Miller v. Raytheon Co.*, _

F.Supp.2d __, 2010 WL 2381199 (N.D. Tex. 2010); *Miller v. Raytheon Co.*, 716 F.3d 138, 144

(5th Cir. 2013).

54.     AT&T has engaged in a pattern and practice of eliminating or forcing out older

women in higher positions with the company, or demoting them to end their career progress, and

its demotion and near-termination of Laird and replacement with younger employees in both her

"permanent" job and her special project job, and its failure and refusal to place Laird in many open

positions for which she was qualified on her level or even at a demoted level (until called on it via

her EEOC charge) is part of that pattern and practice of age and gender discrimination.

**LAIRD FILES AN EEOC CHARGE, "SURVIVES," BUT SUFFERS INJURY**

55.     On November 22, 2017, Laird filed a charge of age and sex discrimination against

AT&T with the United States Equal Employment Opportunity Commission.   In addition to the

one-page EEOC charge itself, Laird filed Attachment A, a 13-page, single-spaced description of

her claims, including this allegation that AT&T is engaging in a pattern or practice of age and

gender discrimination:

> AT&T has engaged in a pattern and practice of eliminating or forcing out
> older women in higher positions with the company, and its termination of me and
> replacement with younger employees in both my "permanent" job and my special
> project job, and its failure and refusal to place me in many open positions for which
> I was qualified on my level or even at a demoted level is part of that pattern and
> practice of age and gender discrimination.

The EEOC issued a notice of right to sue letter on September 30, 2020. Laird is filing this suit within 90 days of the notice. Laird exhausted the necessary administrative prerequisites under Title VII.

56.     On November 22, 2017, Laird, through her attorney, provided her EEOC charge along with her detailed allegations in Attachment A to the charge by letter to the top officers of AT&T:   Randall L. Stephenson, Chairman, Chief Executive Officer and President of AT&T, Inc. and Mr. John Donovan, CEO of AT&T Communications.  Ms. Laird's November 22, 2017 letter requested information and documents relating to her charge of age and sex discrimination within thirty days.

57.     AT&T's top officers did not respond.  AT&T failed to provide any information and documents Ms. Laird requested in her November 22, 2017 letter to Stephenson and Donovan.

58.     AT&T's only reply to Laird's letter to AT&T's top officers, Laird's EEOC charge, and her detailed attachment setting out her allegations of discrimination was a letter from Ms. Juanita Harris, AVP – Senior Legal Counsel dated January 12, 2018.   The letter:

•     Acknowledged receipt of Laird's November 22, 2017 letter.

•     Asserted that AT&T "takes these types of allegations very seriously, and does not tolerate any forms of discrimination or retaliation by or against any of its employees."

•     Claimed AT&T conducted an internal investigation and asserted that "investigation has revealed that that (sic) the allegations contained in your letter are without merit."

•     Added, "It is my understanding that your client has accepted another position with the Company."

59.     Despite AT&T's claim that having received Laird's EEOC charge, her detailed description of her claims, and her pattern or practice assertion on November 22, 2017, by January

12, 2018, despite Thanksgiving, Christmas, New Year's Eve and New Year's Day, its January 12, 2018 letter glibly claimed AT&T **had conducted an internal investigation**.  AT&T failed to interview Laird with respect to her claims.  On information and belief, AT&T conducted, at most, a sham investigation of Laird's complaints of age and sex discrimination and no investigation of her claim that AT&T has engaged in a pattern or practice of unlawful discrimination.

60.     In August 2017, Patel told Laird, "I am now in a position to be more helpful to you (referring to his earlier promotion announcement). Surely, we can find you an opportunity, we are a large organization. **Give me a couple of weeks**."  In the telephone meeting with Devereux on November 16, 2017, Devereux did not suggest prompt action to place Laird in a position, nothing akin to Patel's "couple of weeks" statement.  At 8:30 pm on December 2, 2017, Laird received a text message from one of her former direct reports who had learned that AT&T was terminating her:

> I heard some terrible news that I'm still trying to wrap my head around.  How does somebody that does everything the company says ad goes wherever the company wants them to go and do a damn good job at it get let go?  I really don't understand it.

The news was crushing.  Then, as if by magic, following Laird's filing her EEOC charge and notifying AT&T's highest officers of her charge on November 22, 2017, in December 2017, AT&T offered Laird a job, albeit a demotion, to Director (L3) from her VPMO (AVP L-4) position.   To avoid termination, Laird accepted this position and started her new job in January 2018.  The director-level job was Strategic Alliance Director, supporting Global Business in the systems integrator organization and key clients.

61.     In February 2019, AT&T awarded Laird an Individual Performance Incentive award (IPA) based on her 2018 performance.  About 30% of AT&T employees receive this special award based on performance and achievement.

62.     In late 2019, AT&T asked Laird if she is retiring.  She said no.

63.     On December 2, 2019, AT&T sent Laird a letter advising that "the position you currently hold will be eliminated."  The letter also stated: "you will be placed on surplus status, effective the day following the date that appears at the top of this letter, and you may receive severance benefits if you meet the eligibility criteria."  AT&T followed the May 2017 takeaway and the December 2017 demotion with another demotion "due to reorganization" in January 2020 that Laird had to accept or be fired.  This time AT&T demoted Laird from an L3 position to an L2 position.  Laird is now a Mobility Operations Chief of Staff, L2, back in the organization she was in with AT&T during 2017 and prior.  The two demotions that followed AT&T's takeaway of Laird's L4 position meant that Laird's base salary decreased from what she had as VPMO (AVP – L4) in May 2017 by about 28 percent, and AT&T eliminated substantial bonus income and fringe benefits that Laird enjoyed before her demotions.

64.     Since her demotion and her EEOC charge, Laird has applied for many positions, including L4 positions, seeking to claw back her pre-May 2017 demotion level. AT&T has determined that upward moves are unavailable to Laird due to her age and gender – the factors that caused her demotion, her near-termination, and the hostile work environment AT&T subjected her to.  AT&T has dead ended Laird, is waiting for Laird to leave, and has made it plain that the sooner she leaves, the better.  That is the AT&T message to Laird.  Laird has continued to work at AT&T, doing the best she can, hoping for justice through her EEOC charge and this lawsuit that seeks to address her demotion from the VPMO (AVP – L4) position she had earned and occupied in 2017 and the upward career movement she would have experienced at AT&T but for age and sex discrimination.

## CAUSES OF ACTION

A.    __COUNT ONE:  AGE DISCRIMINATION__

65.    Laird incorporates by reference paragraphs 1 through 64.

66.    AT&T's actions, including but not limited to the takeaway of her L4 job, subjecting her to a hostile work environment, the demotions, and destruction of her career progress were undertaken because of Plaintiff's age and gender and are part of a pattern or practice of age and gender discrimination by AT&T.  These actions constitute a willful, continuing violation of the ADEA.

67.    Due to Defendant's actions Plaintiff has suffered, and continues to suffer, damages including but not limited to lost wage and bonus compensation, both past and future, and the value of fringe benefits, both past and future.

68.    Defendant's actions referenced in paragraphs 1 through 62 were willful, thereby entitling Plaintiff to liquidated damages under 29 U.S.C. § 626 (b).

69.    Defendant's actions referenced above in paragraphs 1 through 62 have caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federal rights in this action.  Plaintiff seeks her reasonable attorneys' fees, expert fees, and costs in this matter. Plaintiff is entitled to attorneys' fees and costs of suit under 29 U.S.C. § 626 (b).

B.    __COUNT TWO:  SEX DISCRIMINATION__

70.    Laird incorporates by reference paragraphs 1 through 69.

71.    Defendant's actions as described above constitute unlawful discrimination on the basis of sex in violation of Title VII, 42 U.S.C. Section 2000e *et seq.*

72.    As a result of Defendant's discriminatory policies, practices and actions, Laird has incurred lost wages and benefits and has suffered mental anguish for which Plaintiff hereby sues.

73.     Defendant's conduct as described above constitutes a malicious violation of Title VII thus entitling Laird to punitive damages.

74.     Laird is also entitled to reasonable attorneys' fees, expert witness fees, and costs.

## JURY DEMAND

75.     Laird requests a jury trial on all issues, claims, actions, and defenses in this case.

## PRAYER FOR RELIEF

WHEREFORE, Laird prays that AT&T be summoned to appear and answer, and that on final trial, judgment be granted against AT&T giving Laird:

a.     A declaration that AT&T actions violated the ADEA and Title VII, plus individually tailored injunctive relief to address and rectify AT&T's pattern or practice of age and gender discrimination against its employees;

b.     Back pay, including but not limited to, lost wages and other employment benefits;

c.     Equitable relief necessary to place Laird in the position that she would have held but for AT&T's discrimination; and, if such relief be not feasible, front pay;

d.     Injunctive relief necessary to permanently and forever enjoin AT&T from discriminating and retaliating against Laird and others who complain of age or sex discrimination;

e.     Compensatory damages;

f.     Liquidated damages under the ADEA and punitive damages under Title VII;

g.     Prejudgment and post-judgment interest;

h.     Attorney's fees, expert fees, and costs of suit; and

i.     Such other and further legal and equitable relief to which Laird may justly be entitled.

DATED:  December 29, 2020          Respectfully submitted,

GILLESPIE SANFORD LLP
4803 Gaston Avenue
Dallas, Texas 75246
Tel.:    (214) 800-5111
Fax:    (214) 838-0001


By:  */s/ Hal K. Gillespie*

Hal K. Gillespie
*Attorney-in-Charge*
Texas Bar No. 07925500
hkg@gillespiesanford.com

ATTORNEYS FOR LORA LEE LAIRD